[Civ. No. 3297. Third Appellate District.—June 29, 1927.]

FRANK SZASZ, Respondent, v. JOYLAND COMPANY (a Corporation), Appellant.

Evan J. Hughes and P. R. Lund for Appellant.

Martin I. Welsh and Robert H. Schwab for Respondent.

FINCH, P. J.—Plaintiff recovered judgment against the defendant for damages in the sum of twenty thousand dollars. The defendant has appealed from the judgment. The facts, which are undisputed, are accurately stated in respondent's brief as follows:

"The defendant owns and operates an amusement park in the City of Sacramento known as Joyland Park. There are numerous concessions leased by defendant to various concessionaires in and about the park, among which is a shooting gallery operated by Mrs. Earl Pappas. On the evening of the 24th day of August, 1924, plaintiff, in company with his father, mother, brother and sister, pursuant to an advertisement in a newspaper, went to Joyland Park for the purpose of seeing a show. Upon arriving at the park the father, after paying the necessary admission for all, plaintiff included, drove his automobile into the grounds of said park. After visiting certain of the attractions about the park, all in the party went to see the show. After the show they proceeded toward the dancing pavilion. While en route to the dancing pavilion, plaintiff requested leave of his father to watch a man shooting at the shooting gallery, which adjoined the dancing pavilion, and leave being granted, plaintiff, with his brother Charles, went over to the shooting gallery and stood in front thereof, and while looking in the direction of the targets, which were situated at the rear end of same, watched the man who was also standing in front of same shooting at said targets.

"While plaintiff and his brother were standing four or five feet to the rear of the man who was shooting at the targets, and to his right, the man shot once, and then shot again. Immediately after the second shot was fired, plaintiff put his hand to his eye and cried out that something had entered it. His father rushed to his side and thereupon made an examination of the eye, but being unable to see what had entered it, because of the dim light, took plaintiff into the dance pavilion and later to the hospital, where treatment was given him pursuant to the doctor's orders. It was determined subsequently by x-ray that some foreign substance had entered the eyeball. Thereupon the doctor made several attempts to remove this foreign substance from the eyeball, but found it impossible to do so, which therefore necessitated the removal of same to save the other eye. Several months thereafter the eyeball was removed. It was then found that the foreign substance was a small piece of lead similar to the lead used in the bullets at the shooting gallery. The gun used was a special shoot-

ing gallery gun, called the Winchester .22, short rifle. The ammunition used was a Remington U. M. C. .22 short, smokeless, greased bullet made of soft lead.

"The shooting gallery was one story in height. It had a ground floor. Its exterior was made of wood. It was 35 or 40 feet wide and about 35 feet long. It had two wooden sides and a wooden end. The front end was open. At the front end there was a counter about three or four feet high, the top thereof being about twelve or fourteen inches wide. The counter ran the full width of the front end of the shooting gallery.

"At the rear end thereof there was a sheet of iron backing which ran the full width and height of same. Half of the sides were iron. Against this backing the bullets shot by the patrons of the shooting gallery struck if they were not intercepted in their flight by either the targets or the edges of the flat iron bars in the iron rack hereinafter described. Between the iron backing referred to and the iron rack there was a space of about two feet. The iron rack was made of iron rods and flat iron bars. The iron rods stood in a perpendicular manner and were used to support the flat iron bars which were lying one above the other in a horizontal manner. The flat iron bars were made of one and one-half or two-inch material and were a quarter of an inch thick and were situated one above the other about four or five inches apart. This iron rack ran the full width of the shooting gallery and almost the full height of same. The flat iron bars in the iron rack were used as shelves to set little iron targets made to represent little birds. These little targets were placed closely together, the full length and height of the iron rack. In other words, they were placed there unattached as targets for the shooters to shoot at if they chose. If any of these iron birds were struck by a bullet they would be knocked off the rack. Suspended from the ceiling of the shooting gallery and four inches in front of and near the iron rack was a swinging target. It was about fourteen or sixteen inches in diameter. It was perfectly round. It was made to represent a clown's face. This swinging target at the time of the shooting was in motion and swung back and forth like the pendulum of an old clock. Attached to the swinging target and to the ceiling was a three-quarter-inch iron pipe

which held the target in position and swung back and forth with it. At different positions in front of the iron rack were a series of targets.''

Appellant contends that the evidence is insufficient to show negligence and that the verdict is excessive in amount. In appellant's opening brief it is correctly stated that ''the uncontradicted testimony in this case is that the shooting gallery in question has been operated, without change in character of equipment or manner of operation for over eleven years and that neither before or after the accident upon which this action is based has there been a single injury to patrons or spectators, save that alleged by plaintiff.'' Appellant concedes ''that the proprietor of a place of amusement, who leases part of his premises to others for kindred purposes, is responsible for the negligence of his concessionaires.'' It has been so decided. (*Johnstone* v. *Panama-Pacific I. E. Co.*, 187 Cal. 323 [202 Pac. 34]; *Harvey* v. *Machtig*, 73 Cal. App. 667 [139 Pac. 78]; *Whyte* v. *Idora Park Co.*, 29 Cal. App. 342 [155 Pac. 1018].) As firearms are dangerous, great care must be exercised in their use. (*Rudd* v. *Byrnes*, 156 Cal. 636, 640 [20 Ann. Cas. 124, 26 L. R. A. (N. S.) 134, 105 Pac. 957].)

The plaintiff was standing in the rear and to the right of the man who fired the rifle and, therefore, could not have been struck by the bullet in its direct course, but the evidence clearly shows that he was hit by a fragment of the bullet. Of course, the path of the bullet was not discernible to the eye of any witness, but the whole situation was such as reasonably to establish the probable manner in which the accident occurred. The rear wall of the gallery was of iron as were also the rear halves of the side walls. About two feet in front of the rear iron wall stood the iron rack consisting, according to the photographs in evidence, of at least eleven horizontal bars supported by eight or more vertical rods, equidistant apart. A bullet glancing against any one of these rods or bars might readily fly off in such an oblique direction as to strike the rear iron wall at a very acute angle and be deflected thence at a similar angle to one of the iron side walls or to one of the bars or rods in the rack, glancing thence towards the place from which it was fired. The number of courses which such a ricocheting bullet might take through the network

of iron rods and bars and against the iron background is infinite. The bullet would probably be broken into fragments which would fly out in different directions. It cannot be held that the evidence does not warrant a finding that the defendant should have anticipated the happening of such an accident and that it was negligent in maintaining the arrangement described. ▮ Since it is a justifiable inference that such arrangement was dangerous and that the danger arising therefrom ought to have been anticipated, mere proof that no such accident ever occurred before does not require a finding in favor of defendant.

▮ There remains the question whether the verdict is excessive in amount. In addition to the pain and suffering caused by the injury and the mortification and humiliation which will naturally be suffered in the future, the plaintiff will be seriously handicapped through life by the loss of his eye. In refusing to disturb a verdict of fifteen thousand dollars for the loss of a foot in *Darling* v. *Pacific Electric Ry. Co.*, 197 Cal. 702, 715 [242 Pac. 703, 709], the plaintiff not being engaged in any gainful occupation, the court said: "Courts have repeatedly refrained from attempting to establish any precise rule for the measurement of damages in actions for personal injuries but, rather from necessity, leave the measurement to the sound sense and fair judgment of the jury," and that a verdict will not be disturbed on the ground that it is excessive unless obviously so disproportionate to the injury as to justify the conclusion that it is not the result of the cool and dispassionate discretion of the jury. In *Kelley* v. *Hodge Transportation System*, 197 Cal. 598, 610 [242 Pac. 76, 81], a verdict was upheld for fifteen thousand dollars on account of damages consisting largely of "facial disfigurements," no organs of the body being permanently disabled. The court said: "Unless we are able to say that the award of damages made by the jury and sustained by the trial court was so grossly disproportionate to any compensation reasonably warranted by the facts as presented to us on appeal as to shock the sense of justice and raise at once a presumption that it was the result of passion, prejudice, or corruption, rather than an honest and sober judgment, this court may not exercise the power of revision." For like reasons, the verdict of the jury in this case cannot be disturbed. Numerous cases

bearing upon the question of verdicts claimed to be excessive are collected in notes as follows: 46 A. L. R. 1282, L. R. A. 1915F, 196, Ann. Cas. 1913A, 1376, and 16 Ann. Cas. 39.

The judgment is affirmed.

Hart, J., and Plummer, J., concurred.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on August 25, 1927.